[Cite as *Beatty v. Urbania*, 2023-Ohio-4491.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
COLUMBIANA COUNTY

M. JOAN BEATTY ET AL.,

Plaintiffs-Appellees,

v.

CHERIE L. URBANIA ET AL.,

Defendants-Appellants.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 23 CO 0010**

---

Civil Appeal from the
Court of Common Pleas of Columbiana County, Ohio
Case No. 2014 CV 599

**BEFORE:**
David A. D'Apolito, Cheryl L. Waite, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Vacated and Remanded.

---

*Atty. Mark A. Hutson*, for Plaintiffs-Appellees and

*Atty. Glenn R. Osborne,* Glenn Osborne Law, and *Atty. Anthony W. Jesko,* Dickie, McCamey & Chilcote, P.C., for Defendants-Appellants.

Dated:  December 11, 2023

**D'APOLITO, P.J.**

{¶1}    Defendants-Appellants, Cherie and Michael Urbania, appeal the January 5, 2023 judgment entry of the Columbiana Court of Common Pleas ("contempt order") finding them in contempt of the trial court's July 28, 2017 Opinion and Final Order as modified[1] in a previous appeal ("2017 Order").  Appellants advance two assignments of error.  First, Appellants contend the trial court violated the law of the case doctrine when it imposed additional burdens on Appellants prior to exercising their rights created by the 2017 Order in the future.  Second, Appellants argue that the trial court erred in finding them in contempt of the 2017 Order, as they had actually complied with the specific term at issue and any asserted ongoing obligation under the specific term would be futile. Because the 2017 Order required the parties to mediate an alleged violation of the order as a condition precedent to the trial court's continuing jurisdiction, the judgment entry of the trial court is vacated in its entirety, and the matter is remanded to the trial court with instructions to the parties to engage in a good-faith mediation.

## PROCEDURAL HISTORY AND FACTS

{¶2}    Appellants and Plaintiffs-Appellees, Lee and Cindy Guterba, are neighbors, whose properties are situated along Copeland Lake and separated by a third property currently owned by Nathan Martin.  Prior to 2019, the Martin property was a rental property owned by Cindy Guterba.  Plaintiff-Appellee M. Joan Beatty is Lee Guterba's mother and the owner of Copeland Lake and the 250 feet of land west of Appellants' property line to the lake's edge, which is the subject of this appeal ("Beatty property"). Hostilities between the parties to this appeal have persisted for over twenty years.

{¶3}    This case represents the second litigation between the parties, the first having been resolved by a 2002 settlement agreement in which Appellants relinquished their lake privileges in exchange for $18,000. In the 2002 release, Appellants agreed to quit claim deed their lake privileges to Appellees and to execute a termination of the easement of lake privileges.

---

[1] The modifications to the 2017 Order are not relevant to this appeal.

**{¶4}** This is the third appeal taken from the second litigation filed in 2014. The complaint and counterclaims in this 2014 action included competing claims for trespass, invasion of privacy, and defamation, as well as an accusation that Cindy killed Appellants' kitten with a rifle. Both parties sought monetary damages and injunctive relief. However, neither party prayed for the equitable relief ultimately fashioned by the trial court.

**{¶5}** Appellees' claims were dismissed on summary judgment, while Appellants' counterclaims proceeded to a jury trial. On the third day of trial, the parties informed the trial court that they were very close to resolving the matter through a settlement agreement.

**{¶6}** The proposed settlement was not monetary, but instead, involved the creation of an easement or license in favor of Appellants on some portion of the Beatty property with two goals in mind: (1) to provide Appellants with some exclusive access and use in order to create a "buffer" between the feuding neighbors; and (2) to restore Appellants' view of Lake Copeland, which had become obstructed due to Appellees' failure to maintain the Beatty property.

**{¶7}** The parties agreed to dismiss the jury and convert the matter to a bench trial, so the trial court could resolve three remaining issues and fashion a remedy through the use of its equitable powers. Post-trial briefs addressed three issues remaining for resolution by the trial court. Although the parties agreed that a buffer zone should be carved from the Beatty property, which was to be bordered by Arborvitae along its southern border, they could not agree on the dimensions of the zone. The second issue for the trial court's consideration was the dimensions of the area west of the buffer zone to the lake's edge. The third issue was lake privileges.

**{¶8}** In the 2017 Order, the trial court resolved the foregoing conflicts as follows: A license was imposed on a portion of the Beatty Property in favor of the Urbanias ("licensed property"). The license was to be "permanent, exclusive, continuous, irrevocable, and personal to [Appellants] so long as the property shall remain owned by [Appellants]." (2017 Order, ¶ A1.) The 2017 Order reads, "[t]he license shall be absolute, without reservation and shall include all rights to use said parcel, to landscape and maintain said parcel, and to use the property as it is were [sic] their own property * * *" (*Id.*)

{¶9}   The 2017 Order further reads:

[Appellants] shall be entitled to open up the property between the property lines to the lake by clearing undergrowth, deadfall, immature saplings, weeds and debris, and by trimming the branches of trees up from the ground to open up the view.  *[Appellants] may remove immature or overcrowded saplings and brush and also selectively prune trees to promote healthy growth and beauty and to remove dead or diseased trees and their limbs.  * * * [Appellants] shall not remove or destroy live mature trees*, nor shall they place any outbuildings or structures on the property described. * * * The Court intends that [Appellants] shall have the primary right and responsibility for beautifying and maintaining the licensed property to the lake front and accordingly, neither Beatty nor Guterba shall obstruct, build upon, alter, change the grade or the land or place any property, objects or debris thereon.

(Emphasis added)(*Id.*, unnumbered paragraph captioned "Opening Up and Landscaping" following section A2(c).)

{¶10}  Section A2(e) of the 2017 Order reads, in relevant part:

[Appellants] shall erect a row of Arborvitae or comparable shrubs beginning at a point near the southwest corner of the [Appellants'] property, (where [Appellants'] wooden fence currently ends) and running westerly along the southern border of the licensed property, a distance of 150 feet towards the shore of Lake Copeland to create a physical division between the lands of Urbania and Guterba.

{¶11}  In the first appeal of the 2017 Order, Appellees argued that the trial court was without authority to impose an equitable remedy not prayed for by either party in their original pleadings. Appellees further argued we could not presume that the parties consented to the equitable jurisdiction of the trial court due to the trial court's failure to recite the parties' alleged consent into the record.  Based on the post-trial briefs and

proposed entries submitted by the parties, we ultimately concluded that the parties jointly invoked the trial court's equity jurisdiction.

{¶12} We next considered whether the trial court had abused its discretion in fashioning the equitable relief. We wrote:

> The trial court did not abuse its discretion in granting an irrevocable license to [Appellants] to access and maintain the land between their property and the lake. The property between [Appellants'] property and the lake was the crux of the dispute as appears from the post-trial filings. Both parties proposed different levels of access and dimensions of the property between [Appellants] and the lake. It was within the trial court's discretion to fashion an equitable remedy that took into account each of the proposals that were submitted by the parties with regard to the disputed area between Appellee's home and the lake.

> However, the granting of the lake access/privileges, which were relinquished by [Appellants] in 2002 for the sum of $ 18,000.00, was an abuse of the trial court's discretion. Based upon the record before this Court, granting lake access was far above and beyond the injunctive relief that Appellees requested pertaining to the behaviors of Appellants that they sought to restrain. Because there is no mention of the restoration of lake access or privileges in the record prior to the [Appellants' post-trial briefs], there is no way of knowing if this was an issue that the parties had considered on the third day of trial when the jury dismissed, or if this was something that Appellees decided to add on to their Proposed Order following the breakdown in negotiations. If this was not considered during those negotiations, but rather raised for the first time in Appellees' Memorandum of Position and Proposed Order, it is unreasonable to expand the area of access beyond what the parties had anticipated and negotiated. The trial court was requested to "close the gap" in settlement negotiations where the parties could not resolve specifics with regard to the mechanics of creating the separation among the parties and the proposed access area

between [Appellants'] property and the lake. The restoration of lake access and privileges exceeds the scope, and represents an abuse of discretion by the trial court.

Thus, based on all of the above, the sole assignment of error has merit with regard to the restoration of lake access/privileges, and the judgment of the trial court is affirmed in part, reversed in part, and remanded on that limited basis.

*Beatty v. Urbania*, 2019-Ohio-245, 131 N.E.3d 413, ¶ 41-43 (7th Dist.).

{¶13} On remand, the trial court ordered the parties to file briefs interpreting the limited remand order. Appellants argued that only their license to fish and boat on the lake should be stricken from the 2017 Order. Appellees argued that the license should be stricken in its entirety because the only reason that the trial court imposed the license was to provide access to the lake to Appellants.

{¶14} The trial court's 2019 judgment entry was the subject of the second appeal in the above-captioned case. As a result of the second appeal, we vacated the 2019 judgment entry, then modified the 2017 Order line-by-line due to the trial court's admitted inability to understand the mandate in the first appeal. *Beatty v. Urbania*, 7th Dist. Columbiana No. 19 CO 0036, 2020-Ohio-3361.

{¶15} The following provision in the 2017 Order governs the trial court's continuing jurisdiction over the case:

The Court retains jurisdiction over enforcement of this Order. Remedies for violation of this Order shall be by Motion to Show Cause, which shall ripen only after an unsuccessful, good faith mediation. Sanctions may include any remedies appropriate in contempt proceedings, at the Court's discretion. In addition, any party found to have violated a material term of this Order shall also be ordered to pay the aggrieved parties' attorney's fees, along with court costs.

(2017 Order, ¶ A3(5).)

Case No. 23 CO 0010

{¶16} On August 23, 2022, roughly two years after the resolution of the second appeal, Appellees filed the motion to show cause at the center of this third appeal. In the motion, Appellees assert an after-the-fact challenge to the removal of five trees[2] by Appellants on the licensed property. According to the motion, prior mediation was futile, as Appellants "continue to insist that they have the right to do what they are doing at any given moment." (Mot., p. 2.) Appellees further assert that a portion of the Arborvitae barrier required by the 2017 Order was presently absent, as a row of small Arborvitae had been planted, but had subsequently died and had not been replaced.

{¶17} The trial court conducted a hearing on the motion to show cause on December 2, 2022. Counsel for Appellants argued that the controversy was not "ripe" based on the provision in the 2017 Order requiring an unsuccessful good-faith mediation as a condition precedent to a motion to show cause. However, the trial court agreed with Appellees that a mediation would be futile. The trial court observed:

> Well, let me see if I can clear this up. Is this not the case? [Appellees'] counsel says [the trees] were alive. You guys [sic] say [the trees were] dead. [What is] there to mediate? * * * I know that [counsel] * * * they make a lot of communication, attempt to resolve things, and we end up here on a regular basis. * * * Mediation – and, again, we had talked about this, and I indicated I would be the mediator in the event that something needed to be mediated, because ultimately [it is] going to come before me again. And I said we might as well just cut out the middleman.

(2/28/23 Hrg. Tr., p. 31-32.)

{¶18} Five witnesses testified at the hearing. Lee and Cindy Guterba, and Nathan Martin, the neighbor who lives on the property between the parties, testified on behalf of Appellees. Michael Urbania and Glenn Wickersham, "the gentleman that [Michael] used to cut down trees over the last 26 years at [his] property," (Id., p. 35), and the man who

---

[2] Appellees conceded that a tree removed by a tree service was dead, but argue on appeal that the remaining trees, which were cleared by Appellants, were live.

recommended that the four trees at issue in this appeal should be removed, testified on behalf of Appellants.

**{¶19}** One day in July of 2022, Appellants began cutting down 60-year-old pine trees. After cutting down four trees, Appellants incinerated the boughs in a burn pile. The logs were stacked along the edge of the southern border of the licensed property. A few days later, the stumps were grounded.

**{¶20}** Based on photographs hastily taken by Cindy Guterba on her mobile telephone from a distance of 150 feet, the Guterbas observed that the pine boughs in the burn pile were green not brown. Lee testified that his grandfather was a tree farmer, who planted the pine trees at issue in this appeal. Lee explained that his observations regarding the trees were predicated upon the knowledge he accumulated over the years from his grandfather. However, Lee conceded that he was not an expert and he was not qualified as an expert at the hearing.

**{¶21}** Martin testified he saw trees "coming down on Lee's property" one day in July of 2022. In order to improve his vantage point, Martin walked to the edge of his property and "Mike was with the chain saw, and Cherie was on the tractor, moving branches." (*Id.* at p. 23.) Martin also took a photograph of the scene.

**{¶22}** Martin further testified that all of the trees that were taken down that day were green, but that a tree service removed one dead tree shortly thereafter. Martin admitted that he was not an expert, but testified that the four trees that were removed by Appellants had green needles and pinecones. The photographs taken by Cindy and Martin were admitted into evidence.

**{¶23}** With respect to the Arborvitae, Lee testified Appellants planted five large Arborvitae (7 or 8 feet in height) and a "row of about four-footers." When the smaller plants died, Appellants covered them in green spray paint, then ultimately removed them. As a consequence, there is a void in the barrier required to be constructed by Appellants on the southern border of the property.

**{¶24}** Michael identified the four trees Appellants removed as "Jack Pine" trees. He testified that his property contained roughly 65 to 70 Jack Pines when he purchased the property 26 years ago. There were roughly fifteen or twenty Jack Pines on the licensed property.

**{¶25}** Michael removed all of the Jack Pines from his own property on Wickersham's recommendation due to earwig infestation. In the summer of 2021 (one year before Appellants removed the trees at issue in this appeal from the licensed property), Wickersham recommended the five trees be removed for the same reason. Michael explained the earwig-infested Jack Pines were both "ugly to look at" and a health and property hazard (they can fall without warning in the wind), as "[e]arwigs eat trees from the bottom up and eat the inside of the tree." (*Id.* at p. 35.)

**{¶26}** Michael testified that the fifth tree, which Appellees now concede was dead, was covered with poison ivy and he was afraid to burn it, so he hired a tree service to remove it. Michael further testified that he photographs trees before he removes them and offered photographs of the trees from 2021 when Wickersham made his recommendation. On cross-examination, Michael conceded that Cindy's photograph of the burn pile depicted green boughs being incinerated, but he explained Jack Pines die from the roots up, so some green needles remain at the top of the tree. (*Id.* at 47.)

**{¶27}** Appellees' counsel asked Michael why he did not remove the trees immediately in 2021 if they were a health hazard. Michael responded that he did not have the trees removed in 2021 because he "[did not] have the funds." (*Id.* at p. 47.) He later testified, "[i]t costs money to bring in dirt. It costs money to put grass seed down. * * * When I – and when I can get to it, and I have the time, and I have the extra resources to do that, I put the land back to where it was originally. I planted the grass. I took out the – I took out the stumps. I beautified it." (*Id.* at p. 55.)

**{¶28}** Appellees' counsel also asked Michael why he did not communicate his intent to cut down the trees at a meeting of counsel and the parties that was held at the licensed property in June of 2022, one month before the trees were removed. Michael responded:

> A couple reasons. Number one is, when we were down, we [were not] talking about trees. We were talking about Lee Guterba having access to the land. * * * Number two is, I study this order, because [I have] been involved in this lawsuit over the last five years. I know what I can do and what I [cannot] do. I [did not] believe that I need[ed] to ask permission [sic] to take down diseased trees, when the order states that I can take down

diseased or dead trees. Even five years ago, when the original order first came down, we had removed several trees.

(*Id.* at p. 53.)

**{¶29}** With respect to the Arborvitaes, Michael testified that the man from the landscaping company who planted the tall Arborvitaes told Michael that Arborvitaes would not survive in the area at issue because the trees and brush near the Arborvitaes are so dense. As a consequence, the landscaping company only planted Arborvitaes in a portion of the required 150-foot space.

**{¶30}** Michael testified that he was told "it [does not] matter what you put in [the remaining space], [it is not] going to grow." (*Id.* at p. 58.) Nevertheless, roughly a year to a year-and-a-half after the 2017 Order was entered, Appellants bought seventeen or eighteen two-to-three-foot Arborvitaes and planted them in the remaining space. They lasted about sixteen months because they do not get any sunlight. Michael testified there are 400 square feet of trees at the back of Martin's property, which butt up against the area, so the area is completely shaded. Michael characterized replacing the small Arborvitaes as a waste of money.

**{¶31}** Wickersham testified that he has been employed in the tree business for 35 years. He began his career working with public utility companies, through a contract with local tree services, then worked as a foreman for a series of tree service companies (Asplundh, Nelson's Tree, Davey's). In 1990, he opened his own tree pruning and removal business. Wickersham testified that he was certified through the various tree services to identify various types of trees for the purpose of pruning them. He further testified that over the course of his career he has removed hundreds of dead trees.

**{¶32}** Wickersham had worked for Michael for 25 years. Shortly after Michael purchased his property, Wickersham removed 44 Jack Pines suffering from earwig infestation from the front yard. Wickersham had trimmed but never removed trees from the licensed area.

**{¶33}** Wickersham testified that he instructed Michael to remove the five trees on the licensed property in 2021 because Jack Pines are a soft wood, and the Jack Pines at issue were heavily infested with earwigs. Wickersham cited a photograph taken by

Michael, which depicts a tree trunk riddled with circular markings, which Wickersham testified are evidence of a "massive infestation." (*Id.* at p. 69.) He further testified that there is no cure or pesticide that can reverse the infestation. Wickersham characterized the trees as "widow makers," due to their propensity to break off at the bottom stump in windy conditions.

**{¶34}** The trial court interrupted Wickersham's testimony, stating, "[I am] confused on where [we are] taking this leap. [He is] not an arborist tree expert. We [are not] there yet." (*Id.* at p. 70.) Ultimately, the trial court concluded that Wickersham's expertise lies in removing trees, not trees themselves, and declined to consider his testimony. Appellants did not ask the trial court to qualify Wickersham as an expert. Wickersham conceded when a municipality removes a tree, an arborist determines whether the tree is dead. Wickersham described an arborist as "a certified tree guy that – through the state * * * It would be a state job." (*Id.* at p. 83.)

**{¶35}** At the conclusion of the hearing, the trial court expressed skepticism regarding Wickersham's conclusions about the trees based largely on the fact that Appellants did not remove them for a full year, despite the alleged threat to persons and property. The trial court also criticized the 2017 Order for failing to vest discretion regarding the removal of trees in either the parties, the mediator, or the trial court, stating:

> It did not say an expert absolutely has to be able to say it. It [does not] have
> – it [does not] say that a – layperson can identify that. So that kind of puts
> me in a predicament here. [I am] trying to do my due diligence and
> addressing [sic] the issue as a whole. The problem is, I have no way to
> independently make that determination. The trees are gone. * * * my
> frustration is, testimony – [Michael] knew a year before he ever did this
> work. He could have easily –he [would not] even have had to get [counsel].
> If he would have just notified the Court, "[I am] looking to cut down these
> trees down, [They are] diseased. Blah, blah, blah." Put it on notice. I get it.
> Entry does not say that, not required of him. And I – I know [that is] what
> the parties are going to – what your response is going to be. I get that.

(*Id.* at p. 86-87.)

Case No. 23 CO 0010

**{¶36}** Further, at the conclusion of the hearing, the trial court endorsed mediation prior to any action taken by Appellants on the licensed property. The trial court reasoned:

[Let us] mediate before we start acting, because ultimately, we end up here because of that. * * * I went to the property, and one of the reasons I went to the property is, you know, we were trying to find a way that we could reasonably resolve this without having to keep doing this. And again, I think the only suggestion I can have is not, you know - discussions need to be had before action is taken. Okay. Because we cannot now undo this.

(*Id.* at p. 88.)

**{¶37}** Following the hearing, the trial court issued a judgment entry finding no violation of the 2017 Order based on the four trees. However, in so finding the trial court opined:

In order for the Court to make a finding of contempt, there must be clear and convincing evidence that a party violated the [2017 Order]. The entry is vague in many areas. The entry does permit [Appellants] to removed [sic] dead or diseased trees, however, it gives no guidance as to how or who determines the condition of the trees. Based on the past history of the parties, it is necessary to give clear guidance to prevent issues of this nature. The Court does not find the evidence present [sic] by either side provides the Court adequate information to determine what the actual state of the trees removed were in at the time of their removal. The Court is not in a position to determine the condition of the trees. No expert testimony was provided by either party to establish by clear and convincing evidence the trees removed were dead or diseased. Also, there was no expert testimony to establish that the trees were mature and healthy. The parties did agree that one of the trees removed by a tree service was in fact dead. As to the remaining four (4) trees, absent the determination by an expert or the ability for an expert to make the determination after the trees had been cut down, there is no sufficient evidence for the Court to find [Appellants] in contempt related to the removal of the trees.

Case No. 23 CO 0010

In order to prevent this same issue arising in in the future, the Court orders that prior to removal of any trees on the licensed area, an expert (an arborist or licensed tree service) must issue a report as to their findings of the condition of the trees and the report shall be provided to the Court before removal.

(1/5/23 J.E., p. 2.)

**{¶38}** With respect to the replanting of the Arborvitaes, the trial court held:

It was undisputed that there is not Arborvitae in the location as set forth in the [2017 Order]. Michael Guterba [sic] testified he attempted to plant Arborvitae in the location and due to sunlight and brush they did not survive. He has made no other attempt to replant Arborvitae or comparable shrub. The Court finds there is clear and convincing evidence [Appellants] have not complied with the Court order as stated in paragraph (e). Finding [Appellants] in contempt, [Appellants] shall have until July 1, 2023 to purge themselves of this contempt. Failure to do so will result in sanctions by the Court.

(*Id.* at p. 3.)

**{¶39}** This timely appeal followed.

## ANALYSIS

## ASSIGMENT OF ERROR NO. 1

**THE TRIAL COURT ERRED AS A MATTER OF LAW BY MODIFYING THE [2017 ORDER] IN VIOLATION OF THE LAW OF THE CASE DOCTRINE DESPITE TWO PRIOR APPEALS AND THIS COURT'S DETERMINATION THAT THE ORDER WAS A FINAL JUDGMENT.**

Case No. 23 CO 0010

## ASSIGMENT OF ERROR NO. 2

**THE DECISION OF THE TRIAL COURT FINDING APPELLANTS IN CONTEMPT FOR FAILURE TO PLANT MORE ARBOVITAE BUSHES ALONG THE SOUTHERN PROPERTY BORDER IS CONTRARY TO LAW WHEN APPELLANTS HAD ALREADY COMPLIED WITH THE ORDER BY PLANTING ARBORVITAE, AND THE BUSHES DIED THROUGH NO FAULT OF APPELLANTS.**

{¶40} Before reaching the merits of the arguments before us, we first consider the jurisdiction of the trial court. In the 2017 Order, the trial court's continuing jurisdiction, which is invoked with the filing of a motion to show cause, is predicated upon a condition precedent, that is, a good-faith mediation. The clear intent of the trial court plainly articulated in the 2017 Order requires the parties to mediate disputes prior to filing a motion to show cause.

{¶41} According to the motion to show cause, mediation was futile, as Appellants "continue to insist that they have the right to do what they are doing at any given moment." (Mot., p. 2.) However, counsel for Appellants argued that the controversy was not "ripe" based on the provision in the 2017 Order requiring an unsuccessful good-faith mediation as a condition precedent to a motion to show cause.

{¶42} The trial court's decision to "cut out the middleman" was extrajudicial in nature as a condition precedent to the motion to show cause had not been satisfied, that is, a good-faith mediation had not been undertaken by the parties. Although the vitriol between the parties to this appeal is palpable, it has not historically foreclosed their ability to reach an agreement. For instance, the parties waived the jury and reached consensus on the resolution of the dispute, leaving only three issues for the trial court to resolve.

{¶43} Insofar as the trial court did not have jurisdiction to consider the motion to show cause, this matter must be remanded for the parties to participate in a good-faith mediation. As a consequence, we find Appellant's assignments or error are moot.

## CONCLUSION

**{¶44}** Because the 2017 Order required the parties to mediate an alleged violation of the order as a condition precedent to the trial court's continuing jurisdiction, the judgment entry of the trial court is vacated in its entirety, and the matter is remanded to the trial court with instructions to the parties to participate in a good-faith mediation.

Waite, J., concurs.

Robb, J., concurs.

---

For the reasons stated in the Opinion rendered herein, it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Columbiana County, Ohio, is vacated. We hereby remand this matter to the trial court with instructions to the parties to participate in good-faith mediation. Costs to be taxed against the Appellees.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## <u>NOTICE TO COUNSEL</u>

**This document constitutes a final judgment entry.**